******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## OREMA TAFT *v.* COMMISSIONER OF CORRECTION
### (AC 46251)

Elgo, Moll and Seeley, Js.

*Syllabus*

The respondent, the Commissioner of Correction, appealed, on the granting of certification, from the habeas court's judgment granting the petitioner's second amended petition for a writ of habeas corpus. The respondent claimed that the habeas court improperly determined that the petitioner demonstrated that he was prejudiced by the alleged ineffective assistance of his first habeas counsel, M, for failing to present certain transcripts from the criminal trial of the petitioner's codefendant, Z, at the petitioner's first habeas trial. *Held*:

The habeas court improperly granted the petitioner's second amended petition, that court having improperly determined that the petitioner established that he was prejudiced by M's allegedly deficient performance, as the petitioner did not present the testimony of the witnesses who had testified at the criminal trials of the petitioner and Z at the second habeas trial and did not offer any evidence concerning how those witnesses would have testified had they been cross-examined about a reward that had been offered prior to the petitioner's criminal trial and about the recantation of certain testimony by one of those witnesses, and, therefore, the second habeas court improperly speculated about the prejudicial nature of their possible testimony and improperly assessed their credibility.

Argued April 16—officially released December 17, 2024

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Henry, J.*; judgment granting the petition; thereafter, the court granted the respondent's petition for certification to appeal, and the respondent appealed to this court. *Reversed*; *judgment directed.*

*Linda F. Rubertone*, senior assistant state's attorney, with whom, on the brief, were *Joseph A. Corradino*, state's attorney, and *Susan Campbell*, assistant state's attorney, for the appellant (respondent).

*Nicole Britt*, assigned counsel, with whom, on the brief, was *Christopher Y. Duby*, assigned counsel, for the appellee (petitioner).

*Opinion*

SEELEY, J. The respondent, the Commissioner of Correction, appeals following the granting of his petition for certification to appeal from the judgment of the habeas court granting the second amended petition for a writ of habeas corpus filed by the petitioner, Orema Taft, in which the petitioner alleged, inter alia, that his habeas counsel in a prior habeas action rendered ineffective assistance. On appeal, the respondent claims that the habeas court improperly granted the petitioner's second amended habeas petition because the petitioner failed to demonstrate that he was prejudiced by the alleged ineffective assistance of his first habeas counsel. We agree with the respondent and reverse the judgment of the court.

The following facts and procedural history, as set forth by our Supreme Court in the petitioner's direct appeal from his conviction or as undisputed in the record, are relevant to our resolution of the petitioner's appeal. "On September 28, 2001, shortly before 3 a.m., the victim, Zoltan Kiss, was shot and killed in his car in the area of 1185 Pembroke Street in Bridgeport. Just prior to the shooting, the victim parked his car across from 1185 Pembroke Street, exited the vehicle, approached some individuals on the street to seek change for a $100 bill and, thereafter, approached a gate leading to an alley next to 1185 Pembroke Street (gate). Shortly thereafter, a group of people, including the [petitioner], exited from behind the gate and followed the victim as he returned to his car. When the victim reached his car, at least one of the pursuers,

Miguel Zapata,[1] began firing a handgun at the victim. Additionally, before the gunfire, one witness heard someone in the group say, 'Let's get this mother fucker.'

"During the autopsy, the medical examiner determined that Kiss' death was caused by multiple gunshot wounds, and that, of the twenty-five bullet wounds in Kiss' body, seventeen were entry wounds. The examiner from the state police forensic laboratory firearms unit analyzed a total of eighteen shell casings recovered from the ground in the area of the victim's car; nine were nine millimeter casings and nine were .40 caliber casings. He determined that all of the nine millimeter casings were fired from one gun, and all of the .40 caliber casings were fired from another single gun." (Footnote in original.) *State* v. *Taft*, 306 Conn. 749, 751–52, 51 A.3d 988 (2012).

Following an investigation, the petitioner and Zapata were both arrested and charged with the victim's murder. Specifically, "the state charged the [petitioner] with murder with a firearm in violation of General Statutes §§ 53a-54a (a) and 53-202k, conspiracy to commit murder with a firearm in violation of §§ 53a-48, 53a-54a (a) and 53-202k, criminal possession of a firearm in violation of General Statutes § 53a-217 (a), and carrying a pistol without a permit in violation of General Statutes § 29-35 (a)." *State* v. *Taft*, supra, 306 Conn. 752; see also footnote 1 of this opinion. Zapata's trial occurred prior to the petitioner's trial, and the prosecutor for both trials was C. Robert Satti, Jr. Zapata was represented

---

[1] "For his role in the victim's death, a jury, in a separate trial that preceded the [petitioner's] trial, convicted Zapata of conspiracy to commit murder with a firearm in violation of General Statutes §§ 53a-48, 53a-54a (a) and 53-202k, murder with a firearm in violation of §§ 53a-54a (a) and 53-202k, and carrying a pistol without a permit in violation of General Statutes § 29-35 (a). See *State* v. *Zapata*, 119 Conn. App. 660, 663, 989 A.2d 626, cert. denied, 296 Conn. 906, 992 A.2d 1136 (2010)." *State* v. *Taft*, 306 Conn. 749, 752 n.5, 51 A.3d 988 (2012).

by Attorney Frank O'Reilly during his criminal trial, and the petitioner's criminal trial counsel was Attorney Erroll Skyers.

At the petitioner's criminal trial, the state presented the testimony of five witnesses[2] and of the police officers who had investigated the victim's murder.[3] "[T]wo witnesses, A and B, testified that they had seen the [petitioner] in the area behind the gate with a number of other individuals.[4] A and B also testified that they had seen guns behind the gate where the [petitioner] and his companions were located. Both A and B recounted that they had seen the victim park his car across the street from the gate and approach the gate. A testified that she had seen the victim interact with someone behind the gate and then begin to return to his car. Shortly thereafter, A saw the group behind the gate chase after the victim, and A further recounted that she had seen both Zapata and the [petitioner] carrying guns as they pursued the victim to his car. B also testified that she had heard someone say, 'Let's get this mother fucker' before gunfire erupted. Both A and B then testified that they had heard shouting and gunfire, and had seen the muzzle flashes as the guns were fired at the victim.[5]

---

[2] Because the criminal court sealed the names of the witnesses, we refer to them by initial in this opinion. See *State* v. *Taft*, supra, 306 Conn. 753 n.7; *Taft* v. *Commissioner of Correction*, 159 Conn. App. 537, 540 n.2, 124 A.3d 1, cert. denied, 320 Conn. 910, 128 A.3d 954 (2015).

[3] Those officers testified that, "shortly after police arrived at the scene of the shooting, they discovered a jacket containing a driver's license for an individual who they knew had associated with [Luisa] Bermudez. On the basis of that discovery, the police began attempting to locate Bermudez to discuss her potential involvement in the shooting. Their investigation led the police to an attic room of a building a few blocks from where the shooting took place, where they discovered Bermudez with the [petitioner], Zapata and A." *State* v. *Taft*, supra, 306 Conn. 754–55.

[4] "A testified that she had seen the [petitioner] with Zapata and Luisa Bermudez, while B testified that she had seen the [petitioner] with Zapata, Bermudez and Michael Cooney." *State* v. *Taft*, supra, 306 Conn. 754 n.8.

[5] During the petitioner's criminal trial, A was questioned regarding a written statement she had provided to the Bridgeport police in July, 2002, in

"The state then presented the testimony of another witness, C,[6] who, at the time of the shooting lived in a third floor apartment of a nearby building. C stated that, at approximately 2 or 3 a.m., on September 28, 2001, she had heard gunfire coming from the street located in front of her apartment. When she went to investigate the noise, C saw four people—the [petitioner], Zapata, Luisa Bermudez and A—standing in front of the door of a car on the street. C further recounted that she had seen the muzzle flashes as the guns were fired at the victim, and she had heard the victim screaming. She also stated that, from her perspective, she could only see Zapata holding a gun and that, after the shooting stopped, the group ran from the scene. . . .

"[T]he state [also] presented testimony from several individuals who had had contact with the [petitioner] while the charges in the present case were pending. First, D testified that he was incarcerated in the same

which she did not inform the police what she had seen on the night of the shooting and, instead, indicated that she, the petitioner, Zapata, and Bermudez were at 639 Barnum Avenue when the shooting occurred. She also was questioned about a second written statement she had provided to the police in December, 2005, which was substantially different from the first one but which was consistent with her trial testimony that, on the night of the shooting, Zapata and the petitioner, with guns in their hands, walked past where she was sitting and started shooting at the victim. When asked why she had changed her story, A responded: "Because I couldn't take this no more. I couldn't take it. The police was harassing me. They was harassing my children, my mother, my father. They was raiding my house. They was raiding my sisters' houses. I was being dragged to jail. I couldn't take it no more." A testified further that, as a result of having witnessed the shooting, she had trouble sleeping because she kept dreaming about the shooting and reliving it, including hearing the victim's screams as he was being shot. A acknowledged that she was in court testifying because she had "no choice," as she had been brought to court to testify pursuant to a capias warrant.

[6] C testified at the petitioner's probable cause hearing but was unavailable to testify at the petitioner's criminal trial due to medical issues. Her prior sworn testimony from the probable cause hearing was read into the record at the petitioner's criminal trial.

prison as the [petitioner], and that the [petitioner] had told him that he and Zapata had shot a 'dude' in a Honda seven times with a .45 caliber gun. D then recounted that the [petitioner] had told him that he and Zapata had chased after the victim because they wanted to take the victim's jewelry. Then, the state presented the testimony of [Germaine O'Grinc],[7] who testified that, during one of his court appearances in connection with a felony charge, he was in the 'bullpen lockup' of the courthouse with the [petitioner] and Zapata. [O'Grinc] recounted that Zapata had told him that he was in court because he and the [petitioner] had shot a person in his car. [O'Grinc] further testified that the [petitioner] had confirmed or 'vouched for' Zapata's statements and had nodded in agreement while Zapata was talking to [O'Grinc]." (Footnotes added; footnote in original; footnote omitted.) *State* v. *Taft*, supra, 306 Conn. 753–55.

During Skyers' cross-examination of O'Grinc at the petitioner's criminal trial, O'Grinc acknowledged that he wanted to get some type of benefit for having provided his statement to the police. O'Grinc further stated that he was facing a term of imprisonment of forty-five years for charges against him at that time and that he hoped to get some type of benefit for testifying at the petitioner's criminal trial, although nothing had been promised to him. On redirect examination, the prosecutor asked O'Grinc whether he was aware that, if he lied under oath, it could affect any benefit he hoped to receive with respect to the charges pending against him, to which he responded in the affirmative. On recross-examination, he clarified that he was saying that he would not lie under oath.

[7] O'Grinc's name, which was sealed at the time of the petitioner's direct appeal, is no longer sealed. See *Taft* v. *Commissioner of Correction*, 159 Conn. App. 537, 542 n.3, 124 A.3d 1, cert. denied, 320 Conn. 910, 128 A.3d 954 (2015).

Following a jury trial, the petitioner was found guilty of murder and conspiracy to commit murder. The trial court rendered a judgment of conviction in accordance with the jury's verdict and sentenced the petitioner "to forty-five years [of] imprisonment on the murder count and twenty years [of] imprisonment on the conspiracy count to run concurrently with each other and consecutively to a sentence that the [petitioner] already was serving on an unrelated conviction." *State* v. *Taft*, supra, 306 Conn. 752–53. The petitioner filed a direct appeal from the judgment of conviction to our Supreme Court, which affirmed the judgment of the trial court. See id., 751 and n.3.

The petitioner thereafter brought his first habeas action, during which he was represented by Attorney Bruce McIntyre. In a second amended habeas petition that was filed on December 10, 2012, the petitioner alleged, inter alia, that his trial counsel, Skyers, provided ineffective assistance by failing (1) to conduct an adequate investigation of the state's offer of a reward for the victim's murder, the testimony of A, B, and C at Zapata's criminal trial concerning the reward, and O'Grinc's testimony at Zapata's trial, at which O'Grinc recanted a statement previously made to the police that inculpated the petitioner, and (2) to cross-examine A, B, and C regarding the reward and O'Grinc regarding his recantation. See *Taft* v. *Commissioner of Correction*, 159 Conn. App. 537, 543, 545, 556, 124 A.3d 1, cert. denied, 320 Conn. 910, 128 A.3d 954 (2015). Following a habeas trial, the habeas court rendered judgment denying the second amended habeas petition and, thereafter, denied the petition for certification to appeal, and the petitioner appealed to this court. Id., 543.

In the petitioner's appeal in the first habeas action, this court set forth the following additional facts. "Prior to the petitioner's arrest, due to the stalled nature of the investigation of the victim's murder, the governor

signed an offer of a $50,000 reward for information leading to the 'arrest and conviction' of the guilty parties. A, B, and C knew about the reward and each received a portion of the reward money after the petitioner's conviction. All three witnesses testified at Zapata's trial, which occurred prior to the petitioner's trial, and O'Reilly cross-examined all three witnesses about the reward. O'Reilly also cross-examined O'Grinc about a statement inculpating the petitioner and Zapata, which O'Grinc had previously made to the police. On cross-examination, at Zapata's trial, O'Grinc recanted his prior statement inculpating the petitioner. *State* v. *Zapata*, 119 Conn. App. 660, 667–68, 989 A.2d 626, cert. denied, 296 Conn. 906, 992 A.2d 1136 (2010).

"In preparation for the petitioner's trial, Skyers did not attend Zapata's trial. Instead, Skyers spoke to O'Reilly about what had occurred at Zapata's trial and discussed with him who the important witnesses were. Relying on O'Reilly's representations, Skyers did not order all of the transcripts from Zapata's trial, including any portion of O'Grinc's testimony. Skyers did request and read the trial transcripts of the testimony of A, B, and C. At the petitioner's criminal trial, Skyers did not cross-examine any of the witnesses about the reward and did not confront O'Grinc about his recantation. O'Grinc testified against the petitioner in accordance with his prior statement inculpating the petitioner by stating that while in lockup with the petitioner and Zapata, Zapata admitted to his and the petitioner's involvement in the murder, and the petitioner nodded in agreement.

"The habeas court found that Skyers 'was aware of and investigated the reward. He spoke with [O'Reilly] and reviewed relevant portions of the codefendant's criminal trial transcripts. After these efforts, [Skyers] made an informed tactical decision to not pursue a line of questioning that had already proved to be unfruitful in [Zapata's] trial.' The habeas court, however, did not

make a specific finding regarding precisely when Skyers became aware of the reward.[8]" (Footnote in original.) *Taft* v. *Commissioner of Correction*, supra, 159 Conn. App. 545–46.

On appeal in the first habeas action, this court determined that "the petitioner's claim regarding Skyers' deficient performance as it relates to his allegedly inadequate investigation of the petitioner's case [was] debatable amongst jurists of reason"; id., 553; as "Skyers' sole reliance on the representations and opinions of O'Reilly regarding what evidence from Zapata's trial would be important for the defense of the petitioner raise[d] a meritorious claim of deficient performance." Id., 548. Nonetheless, this court concluded that the first habeas court "properly found that the petitioner failed to demonstrate any prejudice by any lack of proper investigation, and, thus, it did not abuse its discretion by denying the petition for certification to appeal as to th[at] claim." Id., 553. In reaching that conclusion, this court explained that "[t]he petitioner offered no evidence at the habeas trial as to what Skyers would have discovered if he had read the entire transcript of Zapata's trial. The petitioner did not provide the habeas court with those trial transcripts. Furthermore, *the petitioner also did not offer evidence regarding how O'Grinc or A, B and C would have testified if they had been cross-examined about the recantation or reward*, respectively." (Emphasis added.) Id., 554. This court further stated that, "even if the petitioner had offered the witnesses' testimony or the Zapata transcripts as evidence, he did not establish how this evidence would tend to demonstrate that Skyers would have changed his

---

[8] "At the habeas trial, Skyers could not recollect if he knew about the reward at the probable cause hearing. The habeas court made no specific finding regarding whether Skyers knew, at the time of the petitioner's criminal trial, that O'Grinc had recanted his statement to the police." *Taft* v. *Commissioner of Correction*, supra, 159 Conn. App. 546 n.4.

defense strategy and chosen to cross-examine the witnesses about the reward and recantation. Indeed, the habeas court found that, if the witnesses had been cross-examined about the reward, Satti would have been able to rehabilitate them on redirect examination with evidence damaging to the petitioner: 'Further buttressing [Skyers'] tactical decision was the very reasonable concern of opening the door to additional [and harmful rehabilitation] questioning,' namely, that A, B, and C would have testified to having other motives for testifying at the criminal trial other than the reward— C was motivated to testify by almost being killed in the past for being thought as a snitch in the present case; B was motivated to testify by fear as Zapata had tried to murder her in the courtroom during Zapata's trial; and A was motivated to testify by being arrested and forced to testify pursuant to a capias warrant. As for O'Grinc, Satti would have shown that the petitioner, Zapata, and O'Grinc had a prior history, including alleged participation in the same drug operation and a familial relationship between Zapata and O'Grinc. The habeas court found Satti['s] and Skyers' testimony at the habeas trial credible as to the rehabilitation evidence being more harmful than the cross-examinations being beneficial.

"[This court thus] agree[d] with the habeas court's conclusion that the petitioner failed to establish that he was prejudiced by Skyers' deficient performance, as he did not [offer] any evidence of how the result of his trial would have been different if Skyers had reviewed the Zapata trial transcript[s] in [their] entirety and had cross-examined the witnesses about the reward and recantation. . . . The petitioner . . . failed to prove how any additional information, if it did exist, about the reward or recantation would have altered Skyers' defense strategy or impeachment strategy. The petitioner [also] provided no testimony from the witnesses

as to what they would have said on cross-examination about the reward or the recantation. In sum, the petitioner . . . offered no evidence proving that a different cross-examination of O'Grinc or A, B, and C would have altered the jury's verdict." (Citation omitted.) Id., 555–56.

This court also concluded that the habeas court did not abuse its discretion in denying the petition for certification to appeal with respect to the petitioner's claim in the first habeas appeal that Skyers performed deficiently by failing to adequately cross-examine the witnesses at the petitioner's criminal trial regarding either the reward or the recantation. Id., 556. In doing so, this court stated that, because "the habeas court made no findings as to [whether] Skyers knew about the recantation when O'Grinc testified at the petitioner's trial, and the petitioner did not seek an articulation from the habeas court, we assume for the purposes of this claim that Skyers knew about the recantation at the time that O'Grinc testified at the petitioner's trial. Assuming that Skyers knew of the recantation, Skyers offered a strategic, plausible reason for not utilizing that line of impeachment. On the basis of Skyers' testimony and other evidence, the habeas court found that it was a strategic decision not to cross-examine O'Grinc about the recantation; had Skyers cross-examined O'Grinc about the recantation, Satti would have been able to introduce harmful rehabilitation evidence, negating the benefit of the cross-examination. Thus, we must defer, as the habeas court did, to Skyers' informed, strategic decision.

"We similarly must defer to Skyers' strategic decision not to cross-examine A, B, and C about the state's offer of a reward. The habeas court made no findings of fact as to when Skyers became aware of the reward, and the record is ambiguous. In light of this ambiguity, we assume for the purposes of this claim that Skyers knew

of the reward at the petitioner's probable cause hearing, when he first could have cross-examined C about the reward. The habeas court found that the testimony of Satti and Skyers was credible that the rehabilitation evidence was more harmful than the potential benefit of the cross-examinations. Thus, Skyers made an informed, strategic decision not to cross-examine the witnesses about the reward." Id., 557–58.

Following this court's dismissal of the petitioner's appeal in the first habeas action, the petitioner commenced a second habeas action, which is the subject of this appeal. In his operative second amended habeas petition in the second habeas action, the petitioner initially asserted three counts: count one, alleging ineffective assistance of Skyers at his criminal trial; count two, alleging ineffective assistance of McIntyre at his first habeas trial; and count three, alleging prosecutorial impropriety on the basis of a violation of *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). At the commencement of the second habeas trial, the court dismissed count one on the ground of res judicata and because it was successive of the claim of ineffective assistance of trial counsel in the first habeas action. The petitioner withdrew count three and any claims relating to *Brady*, which included a claim raised in paragraph 30 (d) of count two. The case, thus, proceeded to trial on count two only as it pertained to the claim of ineffective assistance of McIntyre, which alleged that McIntyre was ineffective for failing to pursue an ineffective assistance of counsel claim against Skyers for Skyers' failure (1) to utilize trial transcripts from Zapata's trial in order to cross-examine witnesses concerning inconsistencies in statements made by witnesses and the reward offered in the case, and (2) to make an adequate investigation of the Zapata trial transcripts in order to fully construct a defense at the petitioner's criminal trial and/or probable cause hearing.

The focus of the petitioner's ineffective assistance of counsel claim against McIntyre in count two concerns McIntyre's failure to utilize the trial transcripts from Zapata's criminal trial in the petitioner's first habeas trial.

At the second habeas trial, which took place on June 15, 2022, the petitioner's counsel entered into evidence the transcripts of the petitioner's criminal trial, Zapata's criminal trial, and the petitioner's first habeas trial. The respondent did not enter any exhibits into evidence, and only one witness—McIntyre—testified. Following the trial, the court issued a memorandum of decision granting the petitioner's second amended habeas petition. The court concluded that the petitioner satisfied his burden of proving that McIntyre's performance at the first habeas trial was deficient and that the petitioner was prejudiced by McIntyre's deficient performance. Specifically, the court concluded that McIntyre was deficient for not presenting the Zapata transcripts into evidence at the first habeas trial and that Skyers performed deficiently by conducting an incomplete and flawed investigation and failing to cross-examine A, B, and C about their knowledge of the reward.

The court also concluded that the petitioner was prejudiced by those deficiencies because "critical impeachment evidence was not presented." The court explained that, "[h]ad McIntyre introduced the Zapata trial transcripts, the first habeas court would have had evidence of the eyewitnesses' testimony that was available for Skyers to adequately represent the petitioner at trial—specifically, to prepare for effective cross-examination of the eyewitnesses. Had McIntyre introduced Zapata's trial transcripts, he would have demonstrated to the [first habeas] court that if Skyers had obtained and familiarized himself with O'Grinc's testimony, Skyers too would have gleaned from the transcripts that O'Grinc was an admitted liar and was not a credible

witness. Furthermore, McIntyre would have shown the first habeas court that Skyers would have had knowledge of the fact that O'Grinc's testimony at Zapata's trial did not inculpate [the petitioner]. Additionally, McIntyre would have demonstrated to the first habeas court that had Skyers familiarized himself with the transcripts he would have been prepared to effectively cross-examine O'Grinc about his recantation when he testified at [the petitioner's] criminal trial."[9] The second habeas court concluded: "But for McIntyre's failure to introduce the transcripts from Zapata's trial into evidence, there is a reasonable probability that the outcome of the first habeas proceeding would have been different because [the petitioner] would have demonstrated both deficient performance by Skyers and that he was prejudiced thereby. The evidence presented to this court undermines confidence in the outcome of [the petitioner's] criminal trial."

After the second habeas court rendered judgment granting the second amended habeas petition, the respondent, on the granting of certification, appealed

---

[9] On the issue of O'Grinc's recantation, the second habeas court concluded: "If Skyers had obtained and reviewed Zapata's trial transcripts, he would have known that O'Grinc admitted under oath that he lied to the police in his prior statement. . . . Skyers would have been aware that O'Grinc testified that he lied and made up the statement because he wanted to get a benefit—help with the pending charges against him, [and] so he told the detectives what he thought they wanted to hear. . . . Skyers' failure to obtain and familiarize himself with the transcripts deprived the [the petitioner's] jury of important impeachment evidence that O'Grinc recanted his prior statement when he testified under oath at Zapata's trial only a few months earlier. . . . Had Skyers obtained and familiarized himself with the transcripts of O'Grinc's recantation, Skyers would have been able to use O'Grinc's own testimony to demonstrate bias and show that O'Grinc was only testifying, including falsely, at [the petitioner's] trial for his own benefit. Skyers acknowledged on cross-examination that if he had brought out O'Grinc's recantation, the state would have rehabilitated O'Grinc using the prior statement. Even if the state was able to use the prior statement on redirect, credibility damage would have already been done by Skyers' cross-examination about the recantation."

to this court. Additional facts and procedural history will be set forth as necessary.

Before we address the respondent's claim on appeal, we set forth our standard of review of a habeas court's judgment on ineffective assistance of counsel claims, which is well settled. "In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary. . . .

"In *Strickland* v. *Washington*, [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)], the United States Supreme Court established that for a petitioner to prevail on a claim of ineffective assistance of counsel, he must show that counsel's assistance was so defective as to require reversal of [the] conviction. . . . That requires the petitioner to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable. . . . Because both prongs . . . must be established for a habeas petitioner to prevail, a court may dismiss a petitioner's claim if he fails to meet either prong. . . .

"To satisfy the performance prong of the *Strickland* test, the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances,

the challenged action might be considered sound trial strategy. . . .

"With respect to the prejudice component of the *Strickland* test, the petitioner must demonstrate that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. . . . It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceedings. . . . Rather, [t]he [petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. . . .

"It is axiomatic that courts may decide against a petitioner on either prong [of the *Strickland* test], whichever is easier. . . . [T]he petitioner's failure to prove either [the performance prong or the prejudice prong] is fatal to a habeas petition. . . . [A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." (Citations omitted; internal quotation marks omitted.) *Soto* v. *Commissioner of Correction*, 215 Conn. App. 113, 119–21, 281 A.3d 1189 (2022).

"The use of a habeas petition to raise an ineffective assistance of habeas counsel claim, commonly referred to as a habeas on a habeas, was approved by our Supreme Court in *Lozada* v. *Warden*, 223 Conn. 834, 613 A.2d 818 (1992). . . . *Harris* v. *Commissioner of Correction*, 191 Conn. App. 238, 246, 214 A.3d 422, cert. denied, 333 Conn. 919, 217 A.3d 1 (2019). To prevail on a claim of ineffective assistance of habeas counsel that

is predicated on the ineffective assistance of trial counsel, a petitioner must demonstrate that both trial and habeas counsel were ineffective. . . . [When] applied to a claim of ineffective assistance of prior habeas counsel, the *Strickland* [v. *Washington,* supra, 466 U.S. 687] standard requires the petitioner to demonstrate that his prior habeas counsel's performance was ineffective and that this ineffectiveness prejudiced the petitioner's prior habeas proceeding. . . . [T]he petitioner will have to prove that one or both of the prior habeas counsel, in presenting his claims, was ineffective and that effective representation by habeas counsel establishes a reasonable probability that the habeas court would have found that he was entitled to reversal of the conviction and a new trial . . . . A petitioner who claims ineffective assistance of habeas counsel on the basis of ineffective assistance of trial counsel must satisfy *Strickland* twice; that is, he must show that his appointed habeas counsel and his trial counsel were ineffective. . . . *Britton* v. *Commissioner of Correction,* 185 Conn. App. 388, 420, 197 A.3d 895 (2018), cert. denied, 337 Conn. 901, 252 A.3d 362 (2021). We have characterized this burden as presenting a herculean task . . . ." (Internal quotation marks omitted.) *White* v. *Commissioner of Correction,* 209 Conn. App. 144, 152–53, 267 A.3d 289 (2021), cert. denied, 341 Conn. 904, 268 A.3d 78 (2022).

In the present case, the respondent challenges only the habeas court's finding that the petitioner established that he was prejudiced by McIntyre's allegedly deficient performance. We, therefore, do not address the performance prong of *Strickland* and focus our analysis on the issue of prejudice, which is dispositive of this appeal. See *James P.* v. *Commissioner of Correction,* 224 Conn. App. 636, 645, 312 A.3d 1132, cert. denied, 349 Conn. 911, 314 A.3d 603 (2024).

On appeal, the respondent claims that the habeas court improperly determined that the petitioner satisfied his heavy burden of demonstrating prejudice. Specifically, the respondent argues that, "[e]ven if McIntyre's decision to forgo submitting the Zapata transcripts into evidence fell below prevailing professional norms, it is not reasonably probable that the outcome of the petitioner's first habeas trial would have been different . . . ." This is so, according to the respondent, because the petitioner never presented testimony at the second habeas trial from A, B, C, and O'Grinc concerning what they would have said if cross-examined by Skyers at the petitioner's criminal trial about the reward or the recantation and, without such testimony, the second habeas court's finding of prejudice was based on speculation. The respondent argues further that the second habeas court, without ever seeing A, B, C, or O'Grinc, improperly assessed the witnesses' credibility and assumed that a jury would not have believed those witnesses if they had testified at the petitioner's criminal trial consistent with their testimony at Zapata's trial. We agree.

Because our resolution of the claim on appeal requires us to review the Zapata transcripts, we first set forth the following additional facts regarding the testimony of A, B, C, and O'Grinc at Zapata's criminal trial. During Zapata's criminal trial, A, B, and C each were questioned on cross-examination about the reward that was offered concerning the victim's murder. When A was asked if she was aware that there was a reward in the case, she responded, "[t]hat has nothing to do with me." She further testified that she was not previously aware of the reward and had just become aware of it while she was testifying. She was asked multiple times if she ever heard of the reward previously, each time responding in the negative. B similarly testified that she did not know that there was a

reward offered in the case. That prompted Zapata's attorney to ask: "So, what did you come in here for, out of the kindness of your heart?" B replied: "No, I didn't come here from the kindness of my heart; it's that somebody [saw me at the scene of the shooting] before it happened . . . . Other than that, I wouldn't be here." C testified that she did not find out about the reward until "later on" and that she was "not really interested about the money . . . ." When asked repeatedly if she was trying or expecting to get a portion of the reward, she responded "no" each time. On redirect examination, C testified that she did not have any knowledge of the reward prior to contacting the police regarding the shooting.

O'Grinc testified that he had known the petitioner and Zapata for a number of years and that he was currently incarcerated. When asked about a conversation he had had while in a courthouse lockup with Zapata and the petitioner, O'Grinc mentioned that Zapata indicated that he was in jail on a murder charge for a shooting that took place on Pembroke Street and that Zapata thought that he had his murder case "beat . . . ." When asked further whether Zapata had made any statements to him about the details underlying the murder charge, O'Grinc replied, "[n]ot specifically." That prompted the prosecutor to question O'Grinc about a prior written, sworn statement he had made to the police indicating otherwise. O'Grinc testified that his statement to the police was not true and that he had made it up. The court subsequently allowed a redacted version of the statement into evidence as a full exhibit, and it was read to the jury. The redacted statement provides in relevant part that Zapata told O'Grinc that he killed the victim, that Zapata had the case beat because of lack of evidence, that Zapata said he and the petitioner "went around the car and shot the guy" at least fifteen times, that Zapata said that he and the

Taft *v.* Commissioner of Correction

petitioner "shot the guy" on Pembroke Street, and that the petitioner "was standing right there when [Zapata] was saying how he shot the guy." With respect to the redactions, the court precluded the jury in the Zapata trial from hearing anything about how the petitioner responded in response to Zapata's statements while in the courthouse lockup.

With this background in mind, we turn to the sole issue raised in the petition for certification to appeal, namely, whether the second habeas court properly determined that the petitioner established that he was prejudiced by McIntyre's alleged ineffective assistance for failing to present the Zapata transcripts at the first habeas trial. In other words, the question before this court is whether the second habeas court properly determined that there was a reasonable probability that, if McIntyre had submitted the Zapata transcripts into evidence at the petitioner's first habeas trial, the outcome of the first habeas trial would have been different. See, e.g., *White* v. *Commissioner of Correction*, supra, 209 Conn. App. 152, 164; *Edward M.* v. *Commissioner of Correction*, 186 Conn. App. 754, 767, 201 A.3d 492 (2018).

On the basis of our plenary review of the record before the second habeas court, we conclude that the court improperly determined that the petitioner met his heavy burden of establishing that he was prejudiced by the allegedly deficient performance of McIntyre. The primary basis for our conclusion stems from the fact that the petitioner did not present A, B, C,[10] or O'Grinc

---

[10] As we stated previously in this opinion, C did not testify in person at the petitioner's criminal trial; rather, her testimony from the petitioner's probable cause hearing was read to the jury. The second amended habeas petition alleges ineffective assistance by McIntyre for his failure to pursue an ineffective assistance of counsel claim against Skyers for Skyers' failure to utilize the Zapata transcripts to cross-examine witnesses during the petitioner's criminal trial and/or the probable cause hearing. Thus, although Skyers could not have cross-examined C at the petitioner's criminal trial concerning the reward, the operative habeas petition appears to allege that

as witnesses at his second habeas trial, and he did not offer any evidence concerning how those witnesses would have testified had they been cross-examined about the reward and the recantation at the petitioner's criminal trial or his probable cause hearing. "It is axiomatic that a habeas petitioner who claims prejudice based on counsel's alleged failure to present helpful evidence from a particular witness, must call that witness to testify before the habeas court or otherwise prove what the witness would or could have stated had he been questioned at trial, as the petitioner claims he should have been." (Internal quotation marks omitted.) *Jones* v. *Commissioner of Correction*, 212 Conn. App. 117, 131–32, 274 A.3d 237, cert. denied, 343 Conn. 933, 276 A.3d 975 (2022); see also *Andrews* v. *Commissioner of Correction*, 45 Conn. App. 242, 247–48, 695 A.2d 20 (habeas court correctly determined that petitioner presented insufficient proof of prejudice when petitioner did not call witnesses to testify at habeas trial and, thus, did not establish that their testimony at criminal trial would have been favorable to him), cert. denied, 242 Conn. 910, 697 A.2d 364 (1997).

For example, in *Thomas* v. *Commissioner of Correction*, 141 Conn. App. 465, 466–67, 472, 62 A.3d 534, cert. denied, 308 Conn. 939, 66 A.3d 881 (2013), the petitioner alleged that his trial counsel was ineffective in failing to call a certain witness to testify at the petitioner's criminal trial. The petitioner, however, did not present testimony from that witness at his habeas trial. Id., 472. The habeas court therefore determined that the petitioner failed to show that he was prejudiced by his counsel's failure to call the witness to testify at the criminal trial, and this court affirmed that decision on appeal. Id. In doing so, we stated: "[T]he failure of defense counsel to call a potential witness does not

Skyers should have done so with respect to C at the probable cause hearing. For that reason, we include C in our analysis of the issue of prejudice.

constitute ineffective assistance unless there is some showing that the testimony would have been helpful in establishing the asserted defense." (Internal quotation marks omitted.) Id. Because the petitioner in *Thomas* did not call the witness to testify at the habeas trial, this court concluded that "it [was] thus not possible to find that [the witness'] testimony at the criminal trial would have aided the petitioner. More fundamentally, without [the witness'] testimony at the habeas trial, it [was] not discernible whether he would have testified in accordance with his initial, exculpatory statement to the police or if he would have admitted that he had fabricated that statement as he did on the eve of trial. Without his testimony, the habeas court could not evaluate him as a witness, nor could it assess the likely impact of his testimony." Id.

Likewise, in the present case, without the testimony of A, B, and C at the second habeas trial, it is not possible to discern whether A, B, or C would have testified in accordance with their testimony at Zapata's trial, in which each one denied having knowledge of the reward prior to speaking with the police, or if any one of them would have testified to the contrary. There is also no way of knowing how O'Grinc would have responded to questions about his recantation.[11] Furthermore, the Zapata transcripts do not contain information about the financial circumstances of A, B, or C, and they do not contain testimony supporting an inference that A, B, or C testified against the petitioner at his criminal trial or probable cause hearing in order to receive a portion of the reward money.[12] Consequently,

[11] We are mindful "that courts universally view recantation evidence with a healthy dose of skepticism." *Gould* v. *Commissioner of Correction*, 301 Conn. 544, 568, 22 A.3d 1196 (2011).

[12] In fact, despite the existence of the reward, A did not want to testify and had to be brought to court pursuant to a capias warrant, which undermines any argument that she was there for pecuniary gain. Therefore, the second habeas court's finding that the jury in the petitioner's criminal trial could have inferred, from a cross-examination of A about the reward, that

without their testimony at the second habeas trial, it was not possible for the habeas court to evaluate the strength of any testimony they would have offered had they been cross-examined about the reward or recantation, and the court could not assess the likely impact of their testimony or whether the testimony of any of these witnesses at the criminal trial would have aided the petitioner. See, e.g., id., 472–73.

Nevertheless, the second habeas court did, in effect, assess the impact of any testimony the witnesses might have offered on cross-examination when it concluded that the petitioner was prejudiced by "the inability to effectively cross-examine [the] four witnesses and [show] either their motivations for testifying or undermining credibility," as the presumption underlying that conclusion is that the credibility of the witnesses would have been impeached, and a pecuniary motive for their testimony would have been established, by cross-examination regarding the reward and recantation. In essence, the court found that a cross-examination of these witnesses would have been beneficial to the petitioner, despite not knowing what the witnesses would have testified to if they had been questioned about the reward and recantation. For example, the second habeas court "gave weight to [the petitioner's] argument that, '[e]ven if [the eyewitnesses] all denied coming forward for the reward money, by introducing that information, Skyers would have highlighted to the jury that each of the witnesses had a *compelling motive* for testifying.'" (Emphasis added.) It also concluded that the petitioner was prejudiced because "*critical* impeachment evidence was not presented." (Emphasis added.) The compelling or critical nature of any such

she had a financial motive to testify favorably for the state is not supported by the record and is clearly erroneous.

impeachment evidence, however, had not been estab-lished.[13] The petitioner's case in the second habeas trial thus suffers from the same fundamental problem that existed at his first habeas trial—no live testimony from A, B, C, or O'Grinc "as to what they would have said on cross-examination about the reward or recantation"—without which this court in the prior appeal agreed with the first habeas court's conclusion that the petitioner had not established prejudice. *Taft* v. *Commissioner of Correction*, supra, 159 Conn. App. 554; see also *Jones* v. *Commissioner of Correction*, supra, 212 Conn. App. 131–32; *Thomas* v. *Commissioner of Correction*, supra, 141 Conn. App. 472; *Andrews* v. *Commissioner of Correction*, supra, 45 Conn. App. 247–48.

We, thus, conclude that the second habeas court improperly speculated about the prejudicial nature of any testimony that might have been elicited from the witnesses on cross-examination concerning the reward and recantation. As this court has stated previously, a petitioner cannot meet his burden of demonstrating fundamental unfairness or prejudice by speculation; it must be proved by "demonstrable realities." (Internal quotation marks omitted.) *Grant* v. *Commissioner of Correction*, 121 Conn. App. 295, 303–304, 995 A.2d 641, cert. denied, 297 Conn. 920, 996 A.2d 1192 (2010); see also *Skakel* v. *Commissioner of Correction*, 329 Conn. 1, 40, 188 A.3d 1 (2018) ("[t]he likelihood of a different result must be substantial, not just conceivable" (internal quotation marks omitted)), cert. denied, 586 U.S. 1068, 139 S. Ct. 788, 202 L. Ed. 2d 569 (2019).

Additionally, the second habeas court, in making those presumptions about the witnesses' credibility,

---

[13] On appeal, the petitioner argues that the mere existence of a reward in a case warrants a presumption that the reward is the motivating factor for the witness' testimony, regardless of whether the witness even knew about the reward. The petitioner's argument, however, is not substantiated by evidence in the record, including the Zapata transcripts, and the petitioner has not cited any case law to support this claim.

improperly assessed the credibility of witnesses who never testified at the second habeas trial. "It is generally inappropriate for the trier of fact to assess the witness' credibility without having watched the witness testify under oath." *Santos* v. *Commissioner of Correction*, 186 Conn. App. 107, 116, 198 A.3d 698, cert. denied, 330 Conn. 955, 197 A.3d 393 (2018); see also *Tang* v. *Bou-Fakhreddine*, 75 Conn. App. 334, 352, 815 A.2d 1276 (2003) ("Credibility must be assessed . . . by observing firsthand the witness' conduct, demeanor and attitude. . . . As a practical matter, it is inappropriate to assess credibility without having watched a witness testify, because demeanor, conduct and other factors are not fully reflected in the cold, printed record." (Internal quotation marks omitted.)).

Because A, B, C, and O'Grinc were not called as witnesses at the second habeas trial, the second habeas court impermissibly speculated as to their possible testimony and improperly assessed their credibility. Accordingly, without live testimony from A, B, C, or O'Grinc at the second habeas trial, we conclude that the second habeas court improperly determined that the petitioner met his burden of showing the existence of a reasonable probability that the decision reached by the first habeas court would have been different if McIntyre had introduced the Zapata transcripts at the first habeas trial.

We also do not agree with the second habeas court that the Zapata transcripts, alone, are sufficient to undermine confidence in the outcome of the petitioner's criminal trial. The second habeas court's finding of prejudice is predicated, in part, on its determination that "[t]he Zapata transcripts [were] rife with negative information about both [B] and [A]. . . . Skyers could have combined such negative information with the likely financial gain from the reward money to highlight their motive for testifying for the state, and to cast doubt on

their credibility." Specifically, the second habeas court stated: "[H]ad Skyers familiarized himself with Zapata's trial transcripts, he would have had knowledge that B testified to smoking angel dust and marijuana during the time of August to September, 2001." The court also stated: "Additionally, [B's] testimony at Zapata's trial conflicted with her statement to Detective [Heitor] Texeira. [B] confirmed on cross-examination that she did not tell Detective Texeira that she saw [the petitioner] at the crime scene." With respect to O'Grinc, the second habeas court found that, if Skyers had obtained and reviewed the Zapata transcripts, he would have been aware of O'Grinc's recantation and would have known that O'Grinc was an admitted liar, that he lied in his statement to the police to get a benefit regarding criminal charges pending against him, that he testified at the petitioner's criminal trial to benefit himself, and that O'Grinc's testimony at Zapata's trial did not inculpate the petitioner.

The transcripts from the petitioner's criminal trial, however, show that Skyers did utilize negative information similar to that which was in the Zapata transcripts during his cross-examinations of A and B, with the exception of the reward. For example, at the petitioner's criminal trial, B was questioned about the drugs that she was using at the time of the shooting and testified that, on the night of the shooting, she bought marijuana that was "laced," which she called "purple haze," because there was no "angel dust" available to buy. Skyers also cross-examined B regarding her prior inconsistent statement to Detective Texeira, in which she never mentioned that the petitioner was at the scene of the shooting that night. Similarly, Skyers did cross-examine A regarding her prior drug dealing and felony convictions, as well as her prior inconsistent statement to the police and the fact that she was "being forced to testify under the fear of being held in contempt

. . . .'' See footnote 5 of this opinion. With respect to O'Grinc, Skyers did elicit, through cross-examination of O'Grinc at the petitioner's criminal trial, that O'Grinc wanted to get some kind of benefit from talking with the police about the shooting death of the victim and that O'Grinc spoke with the police for self-serving reasons, namely, to take care of himself. Although, when Skyers asked O'Grinc if he would lie under oath, O'Grinc replied that he would not, the jury had to assess that answer in light of the fact that O'Grinc was a convicted felon and a jailhouse informant.[14]

Finally, we note that the first habeas court credited testimony from Satti and Skyers at the first habeas trial that, if the witnesses had been cross-examined about the reward and the recantation, "Satti would have been able to rehabilitate them on redirect examination with evidence damaging to the petitioner";[15] *Taft* v. *Commissioner of Correction*, supra, 159 Conn. App. 555; and

[14] We note that, even if Skyers had been able to impeach O'Grinc through questioning about his recantation and the fact that O'Grinc testified at Zapata's trial that he lied in his sworn statement to the police, such that the jury would not have found O'Grinc's testimony credible or believable, the state also presented testimony from D, another jailhouse informant, whose testimony was similar to that of O'Grinc. Specifically, D "testified that he was incarcerated in the same prison as the [petitioner], and that the [petitioner] had told him that he and Zapata had shot a 'dude' in a Honda seven times with a .45 caliber gun. D then recounted that the [petitioner] had told him that he and Zapata had chased after the victim because they wanted to take the victim's jewelry." *State* v. *Taft*, supra, 306 Conn. 755. Thus, the record contains testimony from another jailhouse informant to the same effect as that of O'Grinc, that is, that the petitioner acknowledged his involvement in the shooting. The existence of similar testimony in the record from another jailhouse informant diminishes the likelihood that a cross-examination of O'Grinc about his recantation would have had a substantial effect on the result of the criminal trial. See *Skakel* v. *Commissioner of Correction*, supra, 329 Conn. 40; *Edward M.* v. *Commissioner of Correction*, supra, 186 Conn. App. 767.

[15] For example, Satti testified at the first habeas trial that he would have tried to introduce into evidence the prior consistent statement made by O'Grinc to the police, which would have provided confirmation of O'Grinc's testimony at the petitioner's criminal trial that the petitioner was present when Zapata made the comments about how the two of them killed the

that the rehabilitation evidence would have been more harmful than any benefit received from cross-examinations about the reward and the recantation. See *Barlow* v. *Commissioner of Correction*, 343 Conn. 347, 357, 273 A.3d 680 (2022) ("[b]ecause it is the [habeas] court's function to weigh the evidence and determine credibility, [a reviewing court gives] great deference to its findings" (internal quotation marks omitted)); *Bowens* v. *Commissioner of Correction*, 333 Conn. 502, 523, 217 A.3d 609 (2019) ("habeas court is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony"). The second habeas court, however, did not defer to the first habeas court's assessment of the credibility of the witnesses who testified at the first habeas trial, which factored into the first habeas court's decision to deny the petitioner's claim that Skyers performed deficiently in failing to adequately cross-examine witnesses at the petitioner's criminal trial. When we take into consideration the first habeas court's finding that Skyers had made an informed, strategic decision not to cross-examine O'Grinc about the recantation and A, B, and C about the reward, we are hard-pressed to find a reasonable probability that the first habeas court would have made a different decision if it had been able to review the Zapata transcripts.

As we stated previously in this opinion, in cases involving a habeas on a habeas, a petitioner must demonstrate ineffective assistance by both prior habeas

victim. If O'Grinc had been cross-examined about his recantation, there also was a reasonable concern of opening the door to harmful rehabilitation questioning by Satti, who "would have shown that the petitioner, Zapata, and O'Grinc had a prior history, including alleged participation in the same drug operation and a familial relationship between Zapata and O'Grinc." *Taft* v. *Commissioner of Correction*, supra, 159 Conn. App. 555. Additionally, "A, B, and C would have testified to having other motives for testifying at the criminal trial other than the reward—C was motivated to testify by almost being killed in the past for being thought as a snitch in the present case; B was motivated to testify by fear as Zapata had tried to murder her in the courtroom during Zapata's trial; and A was motivated to testify by being arrested and forced to testify pursuant to a capias warrant." Id.

counsel and trial counsel. See *Hilton* v. *Commissioner of Correction*, 225 Conn. App. 309, 328, 315 A.3d 1135 (2024). Thus, the petitioner's claim that his prior habeas counsel provided ineffective assistance must fail "if the claim of ineffective assistance of his trial counsel . . . is without merit." Id., 329. "Simply put, a petitioner cannot succeed . . . on a claim that his habeas counsel was ineffective by failing to raise a claim against trial counsel . . . unless the petitioner ultimately will be able to demonstrate that the claim against trial . . . counsel would have had a reasonable probability of success if raised." (Internal quotation marks omitted.) Id., 328. In the present case, the first habeas court rejected the petitioner's claim that Skyers performed deficiently by failing to cross-examine the witnesses about the reward and recantation and, instead, found, on the basis of its credibility assessment of Skyers' testimony, that Skyers had made a reasonable, strategic decision not to do so, and this court in the first habeas appeal similarly deferred to Skyers' "informed tactical decisions" that those lines of impeachment would not have been fruitful. *Taft* v. *Commissioner of Correction*, supra, 159 Conn. App. 556, 558. In light of the foregoing, we conclude that the petitioner has not established that there is a reasonable probability that the outcome of his first habeas trial would have been different because he cannot show that the first habeas court, which found that Skyers had made a reasonable, strategic decision not to cross-examine A, B, C, and O'Grinc about the reward and recantation, would have changed its determination that Skyers did not perform deficiently in that respect had it viewed the Zapata transcripts.[16]

---

[16] Although we recognize that the respondent challenges only the second habeas court's finding of prejudice, our analysis of the issue on appeal necessarily must include an examination of whether the petitioner's claim of ineffective assistance of Skyers had a reasonable probability of success. See *Hilton* v. *Commissioner of Correction*, supra, 225 Conn. App. 328; see also *Kaddah* v. *Commissioner of Correction*, 211 Conn. App. 823, 837, 274 A.3d 115, cert. denied, 343 Conn. 928, 281 A.3d 1188 (2022); *Haywood* v.

Accordingly, we disagree with the second habeas court's conclusion that the petitioner satisfied his burden of establishing that he was prejudiced by McIntyre's failure to introduce the Zapata transcripts into evidence at the first habeas trial. The evidence presented by the petitioner at the second habeas trial does not demonstrate the existence of a reasonable probability that the outcome of the first habeas trial would have been different had McIntyre done so. The second habeas court, therefore, improperly granted the petitioner's second amended petition for a writ of habeas corpus.

The judgment is reversed and the case is remanded with direction to deny the petitioner's second amended petition for a writ of habeas corpus.

In this opinion the other judges concurred.

---

*Commissioner of Correction*, 194 Conn. App. 757, 766, 222 A.3d 545 (2019), cert. denied, 335 Conn. 914, 229 A.3d 729 (2020).