******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# MARVIN NARCISSE *v.* COMMISSIONER OF MENTAL HEALTH AND ADDICTION SERVICES
## (AC 47195)

Moll, Seeley and Lavine, Js.

*Syllabus*

Pursuant to *Duperry* v. *Solnit* (261 Conn. 309), in all cases "in which a defendant pleads not guilty by reason of mental disease or defect, and the state substantially agrees with the defendant's claim of mental disease or defect, with the result that the trial essentially is not an adversarial proceeding, the trial court must canvass the defendant to ensure that his plea is made voluntarily and with a full understating of its consequences."

The petitioner, who had previously been found not guilty of certain crimes by reason of mental disease or defect and committed to the jurisdiction of the Psychiatric Security Review Board, appealed, on the granting of certification, from the habeas court's judgment denying his petition for a writ of habeas corpus. He claimed, inter alia, that the habeas court improperly determined that the underlying criminal proceeding was contested and adversarial in nature and, thus, he was not required to be canvassed pursuant to *Duperry*. *Held*:

The habeas court did not improperly deny the habeas petition with respect to the petitioner's claim that his plea of not guilty with the affirmative defense of mental disease or defect, made pursuant to statute (§ 53a-13 (a)), was not made knowingly and voluntarily because he was not canvassed pursuant to *Duperry*, as the evidence in the record supported the court's finding that, because the prosecutor did not substantially agree with the petitioner's affirmative defense, the underlying criminal proceedings were adversarial and contested, and, thus, a canvass pursuant to *Duperry* was not required.

The habeas court did not improperly deny the habeas petition with respect to the petitioner's claims of ineffective assistance of trial counsel, as the court correctly determined, on the basis of its assessment of the credibility of the testimony of trial counsel and the petitioner, that the petitioner failed to meet his burden of demonstrating that his trial counsel performed deficiently by failing to advise him properly regarding his affirmative defense of mental disease or defect, and, because this court determined that the canvass requirements of *Duperry* were inapplicable, his claim that trial counsel performed deficiently by failing to advise him regarding those requirements necessarily failed.

Argued February 19—officially released July 1, 2025

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Middlesex and tried to the court, *Oliver, J.*; judgment denying the petition, from which the petitioner, on the granting of certification, appealed to this court. *Affirmed.*

*James E. Mortimer*, assigned counsel, for the appellant (petitioner).

*Jonathan M. Sousa*, assistant state's attorney, with whom, on the brief, were *Joseph T. Corradino*, state's attorney, and *JoAnne Sulik*, senior assistant state's attorney, for the appellee (respondent).

*Opinion*

SEELEY, J. On the granting of his petition for certification to appeal, the petitioner, Marvin Narcisse, who had been found not guilty of certain crimes by reason of mental disease or defect and committed to the jurisdiction of the Psychiatric Security Review Board (board) for a maximum period of forty years, appeals from the judgment of the habeas court denying his third amended petition for a writ of habeas corpus (operative habeas petition).[1] In the operative habeas petition, he alleged that his plea of not guilty with the affirmative defense of mental disease or defect, made pursuant to General Statutes § 53a-13 (a),[2] was not made knowingly

---

[1] The operative habeas petition, which was filed on July 20, 2020, and is titled "Amended Petition," is actually the petitioner's third amended habeas petition.

[2] General Statutes § 53a-13 (a) provides: "In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time the defendant committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law."

Although § 53a-13 (a) was the subject of a technical amendment in 2019; see Public Acts 2019, No. 19-27, § 1; that amendment has no bearing on the merits of this appeal. For simplicity, we refer to the current revision of the statute.

and voluntarily because he was not canvassed pursuant to *Duperry* v. *Solnit*, 261 Conn. 309, 329, 803 A.2d 287 (2002), and that his criminal trial counsel, Attorney Kim W. Mendola (trial counsel), had provided ineffective assistance. On appeal, the petitioner claims that the habeas court improperly determined that (1) the underlying criminal proceeding was contested and adversarial in nature and, thus, that the petitioner was not required to be canvassed pursuant to *Duperry*, and (2) his trial counsel did not render deficient performance by failing to advise the petitioner regarding the canvass requirements of *Duperry*.[3] We disagree with both claims and affirm the judgment of the habeas court.

We first set forth the facts underlying the criminal charges that were brought against the petitioner, as found by the court, *Devlin, J.* "On the afternoon of December 22, 2011, [the victim, Margery Meketa] exited a store located near the intersection of William Street and Roosevelt Street in Bridgeport . . . . At that time

---

[3] We note that, in his operative habeas petition, the petitioner alleges that his trial counsel was ineffective on the basis of six grounds, namely, that trial counsel (1) "failed to advise him of and [to] explore options other than [his] plea" with the affirmative defense of mental disease or defect, (2) "pressured [him] to take the plea rather than explore other options such as a plea agreement," (3) "improperly advised him that he would be committed [to] the [jurisdiction of the board] for . . . a short period of time," (4) "failed to advise him regarding the *Duperry* canvass requirements," (5) "failed to ensure that [he] was properly canvassed," and (6) "failed to advise him that he could withdraw his plea or appeal the validity of his plea based on the inadequacy of the canvass." (Emphasis omitted.) On appeal, the petitioner challenges only the court's determinations that trial counsel was not ineffective in failing to advise him regarding his affirmative defense of mental disease or defect and concerning the canvass requirements of *Duperry*. We, therefore, limit our analysis to those grounds and deem any claim relating to the other grounds raised in the operative habeas petition abandoned. See *Walker* v. *Commissioner of Correction*, 176 Conn. App. 843, 856, 171 A.3d 525 (2017) (when claim raised at trial is not adequately briefed on appeal, claim is deemed abandoned); *Merle S.* v. *Commissioner of Correction*, 167 Conn. App. 585, 588 n.4, 143 A.3d 1183 (2016) (claims alleged in habeas petition that were denied by habeas court but not pursued by petitioner on appeal were deemed abandoned).

. . . Meketa was over sixty years of age and in fact was approximately seventy-seven years old. As she walked from the store on the sidewalk, the [petitioner] ran toward her from the rear. As the [petitioner] approached . . . Meketa, he increased his speed and tackled her like a football player.

"[Meketa] fell forward and with great force hit her head on a concrete sidewalk. The [petitioner] then proceeded to stab [her] repeatedly in the face with a broken off stem of a wine glass. He also stomped [on] and kicked her. Alfredo Serrano observed the attack and came to . . . Meketa's aid. He . . . fought with the [petitioner] to get him away from . . . Meketa. During their tussle, the [petitioner] was able to break loose from Serrano and returned to his attack on . . . Meketa, again stomping [on] and kicking her. He also tried to lift her shirt to get at her bare skin with the glass stem.

"Eventually, a third person, Dennis Shaw, enter[ed] the fracas to assist Serrano, and the two were ultimately able to pull the [petitioner] away. The police arrived on the scene soon after. Following the break-up of the attack, but while all parties were still on the scene, a witness video recorded what was happening. [The] video, which was played [to the court], shows . . . Meketa motionless on the ground with gruesome injuries to her head and substantial bleeding. The video also shows the [petitioner] seated on the ground with his back against a fence. On [that] December afternoon, he [was] wearing only a T-shirt, socks, no shoes, [and] boxer shorts with no trousers or pants.

"During [the] incident, the [petitioner] made no effort to steal . . . Meketa's purse or any of her other property. He was described by witnesses as acting deranged and in a rage directed at . . . Meketa. There's no evidence that these people knew each other or had ever had any contact whatsoever before this day."[4]

---

[4] The court also found that, "[f]ollowing the assault . . . Meketa spent several months in the hospital. Initially, she was not able to talk and could

Following the assault, the petitioner was charged with attempt to commit murder in violation of General Statutes §§ 53a-49 and 53a-54a, assault in the first degree in violation of General Statutes § 53a-59 (a) (1), and assault of an elderly person in the first degree in violation of General Statutes § 53a-59a (a). The petitioner elected to be tried to the court, which canvassed him regarding his waiver of his right to a jury trial. A trial to the court, *Devlin, J.*, took place on March 12 and April 9, 2013, after which the court found that the state had proven the elements of the charges beyond a reasonable doubt. The court, however, also found that the petitioner had met his burden of establishing his affirmative defense that, as a result of mental disease or defect, he "lacked substantial capacity . . . to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law." General Statutes § 53a-13 (a). Following the submission of a report to the court prepared by the respondent, the Commissioner of Mental Health and Addiction Services, concerning the petitioner's mental condition and a hearing thereon, the court found that the petitioner "constitute[d] a danger to himself and to others" and ordered that he "be committed to the jurisdiction of the [board] and . . . be confined in a hospital for psychiatric disabilities for a maximum of forty years."

The petitioner commenced this habeas action in May, 2016. In his operative habeas petition, he alleged two counts: in count one, he alleged that the trial court improperly failed to canvass him in accordance with the requirements of *Duperry*; and, in count two, he alleged that his trial counsel provided ineffective assistance. See footnote 3 of this opinion. A habeas trial took place on February 6, 2023. The petitioner presented as

not breathe on her own as a result of the injuries sustained in the assault. She is now in a wheelchair being unable to walk and she has memory loss . . . and other medical problems."

witnesses himself and his trial counsel, and offered several exhibits into evidence, which were admitted. The respondent offered no witnesses or exhibits. Following the evidentiary hearing, the habeas court rendered judgment denying the operative habeas petition. Thereafter, the habeas court granted the petition for certification to appeal, and this appeal followed. Additional facts and procedural history will be set forth as necessary.

Before turning to the merits of the petitioner's claims on appeal, we set forth our standard of review governing habeas corpus appeals. "The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . Accordingly, [t]he habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review." (Internal quotation marks omitted.) *Canady* v. *Commissioner of Correction*, 231 Conn. App. 603, 610, 333 A.3d 797, cert. denied, 352 Conn. 901, 334 A.3d 1006 (2025).

I

The petitioner's first claim is that the habeas court improperly determined that the underlying criminal proceeding was contested and adversarial in nature and, thus, that the petitioner was not required to be canvassed pursuant to *Duperry*. We are not persuaded.

Because the petitioner's first claim is predicated on *Duperry* v. *Solnit*, supra, 261 Conn. 309, we first provide a brief discussion of that case and other relevant case law. In *Duperry*, the petitioner, who had been charged with arson in the first degree and the manufacture of bombs in connection with the explosion of a pipe bomb

at a psychiatric treatment facility; id., 312–13; was found not guilty of those crimes by reason of mental disease or defect and was committed to the jurisdiction of the board "to be confined in a hospital for psychiatric disabilities for a maximum term of twenty-five years." Id., 315. The petitioner in *Duperry* subsequently filed a petition for a writ of habeas corpus alleging, inter alia, that "his plea of not guilty by reason of mental disease or defect violated his due process rights under both the federal and state constitutions because he was not made aware of and did not fully understand the consequences of his plea . . . ." Id. The habeas court agreed with that claim, concluding, inter alia, that " '[t]he requirements governing the taking of a guilty plea also apply to the acceptance of a plea [of] not guilty by reason of mental disease or defect' "; id., 315–16; and that "the record was devoid of any indication that the trial court had canvassed the petitioner in a manner analogous to the requirements of Practice Book § 39-19, which prescribes the required canvass of a defendant who pleads guilty . . . ." (Footnote omitted.) Id., 316. The habeas court, therefore, concluded that the petitioner, at the time of his plea, did not "understand the consequences of pleading not guilty by reason of mental disease or defect, thereby rendering his plea involuntary." Id.

On appeal in *Duperry*, our Supreme Court determined that the habeas court, "by concluding that a criminal defendant who pleads not guilty with the affirmative defense of mental disease or defect must be canvassed as though he is pleading guilty to ensure that his plea is made knowingly and voluntarily"; (footnote omitted) id., 311; "improperly established a new constitutional rule in a collateral proceeding in contravention of the principle announced in *Teague* v. *Lane*, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989)"; *Duperry* v. *Solnit*, supra, 261 Conn. 311; in which the United

States Supreme Court held that, "in general, new constitutional rules should not be declared or applied in collateral proceedings, such as habeas corpus review." Id., 318. Nevertheless, our Supreme Court exercised its supervisory authority over the administration of justice and ruled that, "in all future cases in which a defendant pleads not guilty by reason of mental disease or defect, and the state substantially agrees with the defendant's claim of mental disease or defect, with the result that the trial essentially is not an adversarial proceeding, the trial court must canvass the defendant to ensure that his plea is made voluntarily and with a full understanding of its consequences." Id., 329. The court in *Duperry* did not define what it means to "substantially [agree] with a defendant's claim of mental disease or defect . . . ." Id. Notably, after the petitioner in *Duperry* "pleaded not guilty by reason of mental disease or defect and opted for a court trial . . . [the trial] began immediately. In accordance with their prior discussions, the parties presented their respective cases without opposition. First, the parties presented evidence with respect to the petitioner's mental state, and, second, the state introduced evidence regarding the underlying charges. The entire proceeding was completed in less than two hours, and the trial court immediately rendered its judgment . . . ." Id., 314.

Just over two years after the decision in *Duperry*, our Supreme Court decided *State* v. *Ouellette*, 271 Conn. 740, 859 A.2d 907 (2004). In *Ouellette*, following a trial to a three judge court, the trial court rejected the defendant's affirmative defense of mental disease or defect and found him guilty of murder. Id., 742–43. On appeal, the defendant, relying on *Duperry*, claimed, inter alia, that "his constitutional right to due process was violated by virtue of the trial court's failure to canvass him in connection with his plea of not guilty by reason of mental disease or defect to ensure that his plea was

knowing, voluntary and intelligent . . . ." Id., 743. Our Supreme Court rejected this claim, concluding that "the defendant's due process rights were not implicated by virtue of the trial court's failure to canvass him regarding his plea of not guilty by reason of mental disease or defect." Id., 769. In reaching that conclusion, the court first noted that, in adopting a rule in *Duperry* "requiring trial courts to canvass defendants who elect to plead not guilty by reason of mental disease or defect," it had limited the rule in two important respects. Id., 767. "First, the rule is prospective in nature, and second, it applies to cases in which the state substantially agrees with the defendant's claim of mental disease or defect, with the result that the trial essentially is not an adversarial proceeding . . . ." (Internal quotation marks omitted.) Id.

The court explained further: "As we observed in *Duperry* . . . and as courts in a number of other jurisdictions also have recognized; [see] e.g., *Miller* v. *Angliker*, 848 F.2d 1312, 1320 (2d Cir.), cert. denied, 488 U.S. 890, 109 S. Ct. 224, 102 L. Ed. 2d 214 (1988); *United States* v. *Brown*, 428 F.2d 1100, 1102–1103 (D.C. Cir. 1970); there are certain practical similarities between guilty pleas and pleas of not guilty by reason of mental disease or defect or by reason of insanity. We know of no court, however, that has required, as a matter of *constitutional law*, a . . . canvass [pursuant to *Boykin* v. *Alabama*, 395 U.S. 238, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969)] of a defendant who pleads not guilty by reason of mental disease or defect or by reason of insanity. Moreover, those courts that have required such a canvass have done so not as a matter of constitutional mandate but, rather, on the basis of prudential considerations; [see] e.g., *United States* v. *Brown*, supra, 1103–1104; *State* v. *Shegrud*, 131 Wis. 2d 133, 138, 389 N.W.2d 7 (1986), cert. denied, 479 U.S. 1037, 107 S. Ct. 891, 93 L. Ed. 2d 843 (1987); see *People* v. *Vanley*, 41 Cal. App.

3d 846, 856, 116 Cal. Rptr. 446 (1974); *Legrand* v. *United States*, 570 A.2d 786, 792–94 (D.C. App. 1990); and even then, only in circumstances in which the state has not opposed the defendant's claim or in which the facts are not otherwise in dispute. See, e.g., *United States* v. *Brown*, supra, 1103; *People* v. *Vanley*, supra, 853; *Legrand* v. *United States*, supra, 788; *State* v. *Shegrud*, supra, 135. Indeed, in truly contested cases, we reasonably may presume that, in light of the adversarial nature of the proceeding, defense counsel will be particularly diligent in advising the defendant of the effect that a claim of mental disease or defect is likely to have on the defendant's rights. In the absence of any precedent or other authority to indicate that a court is constitutionally required to canvass a defendant who pleads not guilty by reason of mental disease or defect, and in view of the fact that the state vigorously contested the defense raised by the defendant, we conclude that the defendant's due process rights were not implicated by virtue of the trial court's failure to canvass him regarding his plea of not guilty by reason of mental disease or defect." (Citation omitted; emphasis in original; footnote omitted.) *State* v. *Ouellette*, supra, 271 Conn. 768–69.

With that background in mind, we set forth the following additional facts, which are relevant to our resolution of this claim. The petitioner's criminal trial commenced on March 12, 2013, with the state presenting its case concerning the charged offenses. In particular, the state presented testimony from the two witnesses to the assault on the victim—Serrano and Shaw—both of whom described in detail the circumstances of the attack, with Serrano stating that he thought that the petitioner was "high on some drugs," and Shaw testifying that he had told the police that he believed that the petitioner was "crazy." The state presented testimony

from two other witnesses, submitted exhibits into evidence, and rested its case-in-chief that day. The petitioner did not challenge any of the state's evidence concerning the charged offenses.

The trial resumed on April 9, 2013, when the petitioner began presenting evidence in support of his affirmative defense of mental disease or defect. The petitioner's first witness was Alexander Westphal, a psychiatrist and fellow in the Department of Law and Psychiatry at Yale School of Medicine who had examined the petitioner and made findings concerning his mental health in a written report that was submitted into evidence. Westphal testified regarding the petitioner's psychiatric history, which included, inter alia, a history of having visual and auditory hallucinations; a family history of bipolar disorder, depression, and anxiety; and a history of "extensive [phencyclidine (PCP)] use," for which he was hospitalized. Westphal testified that the petitioner "has a very substantial history of substance abuse. He's used a variety of substances, beginning with marijuana, but later, as he got older, used most, I think, importantly PCP repeatedly." When asked whether "the usage of the drugs [was] the cause of [the petitioner's] illness," Westphal responded, "[n]o," but that "it could have contributed . . . ." Westphal testified that, in his opinion and to a reasonable degree of medical certainty, the petitioner suffers from a mental disease, namely, "schizoaffective disorder," which "prevented him from understanding the wrongfulness of his actions . . . ." The prosecutor cross-examined Westphal with respect to his diagnosis of the petitioner, asking whether, inter alia, there is a violent aspect to patients with schizoaffective disorder, to which Westphal responded that patients diagnosed with that disorder typically do not have violent symptoms. Afterward, Westphal confirmed

that the ingestion of PCP could cause an otherwise nonviolent person to become violent.[5]

On cross-examination, the prosecutor also questioned Westphal regarding whether, in his thorough investigation of the petitioner's background, he ever "notice[d] any . . . incidents of violent contact or . . . unprovoked attacks on other people [aside from the event that formed the basis for the charges in the present case]," to which Westphal responded in the negative. The prosecutor also questioned Westphal regarding whether there was anything in the petitioner's "environment that may have contributed to [his] sudden snap" from a person experiencing "baseline fluctuation of psychiatric symptoms to one that he's never had before, where he's attacking people." Additionally, the prosecutor questioned Westphal concerning the petitioner's inability to recall the attack on the victim and whether he thinks it is possible for a person "to have

---

[5] Specifically, the following colloquy transpired:

"[The Prosecutor]: All right. And, would you say also that if someone was taking certain drugs or medications—like, for instance, PCP—would that tend to have an influence on a person who had this kind of disorder?

"[Defense Counsel]: Your Honor, objection. Foundation.

"The Court: No, the doctor testified that [the petitioner] said he took PCP a lot. No, that's overruled.

"[The Prosecutor]: Would that have—do you think that would have an impact on symptoms that somebody would . . . experience?

"[Westphal]: Would the ingestion of PCP have impact?

"[The Prosecutor]: Yes.

"[Westphal]: Yes.

"[The Prosecutor]: Could it make it—if somebody was not violent before, could it make it so that they were violent after taking that?

"[Westphal]: Yes.

"[The Prosecutor]: The effect that it might have, would it be . . . only concurrent with the administration of the . . . drug or would it have a residual effect as well?

"[Westphal]: The aspect of PCP, which had been associated with violence, is . . . related to the acute phase of intoxication.

"[The Prosecutor]: And is there also some impact that, aside from the acute phase, it could have some residual effect as well?

"[Westphal]: Yeah. It affects cognition and it affects mood."

[a] psychiatric illness and not [be] malingering . . . but actually experiencing [the illness] but still be able to lie," to which Westphal replied, "[y]es, absolutely." On redirect, Westphal responded, "[n]o," when asked whether, in his review of the records of the Department of Correction following the assault, he saw "any indication of a positive blood test for any other substance like the PCP." The prosecutor also cross-examined Madelon Baranowski, a psychologist and associate professor in the Department of Law and Psychiatry at Yale School of Medicine who testified for the defense and also had evaluated the petitioner, and asked her several questions concerning the petitioner's memory.

During closing remarks, the prosecutor first stated his position that the testimony of the eyewitnesses established beyond a reasonable doubt that the petitioner committed the charged offenses. With respect to the issue of the petitioner's affirmative defense of mental disease or defect, the prosecutor acknowledged that he was not able to suggest an alternative motive for the assault and that there was no question that the petitioner suffers from a mental illness. He argued, however, that, when "assessing *whether* . . . the elements of the defense have been met by a preponderance [of the evidence]," the question before the court was whether the petitioner's assault against the victim occurred as part of his mental illness or whether it was influenced by the petitioner's use of drugs, which would have precluded the petitioner's affirmative defense pursuant to § 53a-13 (b).[6] (Emphasis added.) Ultimately,

---

[6] General Statutes § 53a-13 (b) (1) provides: "It shall not be a defense under this section if such mental disease or defect was proximately caused by the voluntary ingestion, inhalation or injection of intoxicating liquor or any drug or substance, or any combination thereof, unless such drug was prescribed for the defendant by a prescribing practitioner, as defined in section 20-571, and was used in accordance with the directions of such prescription."

Although § 53a-13 (b) has been the subject of minor amendments after the events in the present case; see Public Acts 2023, No. 23-19, § 16; Public Acts 2021, No. 21-192, § 12; Public Acts 2020, No. 20-4, § 11; Public Acts

the prosecutor stated that this case presents a "fifty-fifty situation," in that there was no doubt that the petitioner suffered from a mental illness but that questions remained as to what had caused the petitioner to become violent and attack the victim.[7]

2019, No. 19-27, § 1; those amendments have no bearing on the merits of this appeal. For simplicity, we refer to the current revision of the statute.

[7] In particular, the prosecutor stated: "[F]irst of all . . . the [petitioner] . . . [has] a psychiatric record going . . . back to when he was eight years old. He has a criminal record spanning a long period of time. . . . Westphal seems to have conducted a serious study of . . . both. What is absent is any violence. He gets . . . irritable, he . . . seems to make people uncomfortable, but he hasn't committed any act of . . . violence. So, the question becomes . . . you have this long-standing mental illness, why today . . . what has happened? Is there something in the environment that has caused this situation to escalate or is it just a random, psychiatric event that causes him suddenly, after all this time, to suddenly go out and lash out in the manner that he did, at some person . . . that he's not even involved with, just a random person on the street.

"And . . . there are other issues. He uses drugs. It's reported here in the report that he has used just about every kind of drug that could exacerbate his condition. He uses PCP with and without marijuana. He uses PCP with and without ketamine. He . . . smokes that drug. He's . . . had violations of his parole for that. He's tested positive for PCP.

"Back in 2011 [at the time of the assault], they didn't—unfortunately, there is none around the time when this event occurred, but he was using . . . according to the report, he reported using this K2 and Spice, which are . . . chemicals similar to THC, one of the principal psychoactive substances in marijuana, and they are synthesized without any oversight—mostly in China . . . . However . . . they are different from the normal marijuana in that they confer a greater risk of psychosis, particularly in people already vulnerable to psychosis.

"So, on the one hand . . . the conclusions and the testimony give us a person with a baseline of a person with a mental illness, there's . . . no way to contest that, but we find him engaging in conduct for which there's no rational motive, which [he] does report no memory for. And . . . there is no medical suggestion of . . . anything, other than speculation, as to what could have happened to change that behavior on this day from what he's been doing for all this time, to suddenly becoming homicidal, basically.

"And the only thing we have on the other hand is his use of the drugs. This is something—it's all over the doctor's report. All kinds of drugs, which could exacerbate symptoms. So, we don't know if he did or he didn't. We don't know that he didn't [take drugs].

"And so, I think the position that I would take is . . . that we're at this fifty-fifty situation, which is not . . . a situation [that] is contemplated by

At the habeas trial, the petitioner's trial counsel testi-fied at length regarding the circumstances surrounding the petitioner's underlying criminal trial. She testified that, at some point prior to trial, there were discussions about a not guilty plea with the affirmative defense of mental disease or defect but that "[t]he state refused to agree to" the affirmative defense of mental disease or defect, as "the state did not agree that . . . [it] was an appropriate disposition."[8] Trial counsel testified that, during those pretrial discussions, "Judge Devlin . . . felt that . . . although the state didn't have any evi-dence, he felt there was a drug ingestion component to the case, and he said [that the parties could] certainly take a go at it at trial, but there were no guarantees at all." Trial counsel explained that the state's reasoning for opposing such a defense was because "[t]he victim's family was very much against it," and because the state "simply felt it was far too serious [of a case] and thought there was a drug component to it . . . ." Trial counsel testified that the state did not dispute that the petitioner had a mental illness but was "adamantly opposed to the use of the [not guilty by reason of mental disease or defect] defense because . . . there was some indica-tion that [the petitioner] has used PCP and actually was

the statute. . . . [W]e know there was a spontaneous shift in his mental condition. . . . [W]as it spontaneous in that . . . it just occurred as part of the course of his illness or was it influenced by what we know to be something that he does, which is that he uses these types of drugs."

The prosecutor then referred to the language in § 53a-13 (b) (1), which provides that "[i]t shall not be a defense under this section if such mental disease or defect was proximately caused by the voluntary ingestion . . . of intoxicating liquor or any drug . . . unless such drug was prescribed," and stated that it was not the state's burden to prove that the petitioner was using drugs and that the defense had not established that the assault was not prompted by the petitioner's use of drugs. Immediately following those remarks, the court noted that, two months prior to the assault, the petitioner had tested negative for drug use but that no further testing had been conducted thereafter, especially when the petitioner started behaving strangely sometime in November, 2011.

[8] We note that the prosecutor at the petitioner's criminal trial, John Smriga, was not called to testify at the petitioner's habeas trial.

a known PCP user in the neighborhood and . . . that contributed [to the cause for the assault] and not a mental illness," even though there was "no evidence" of the petitioner having used PCP on the day of the attack.[9] Trial counsel repeatedly testified that the state "strongly" contested the petitioner's affirmative defense and that the petitioner's "drug issue" was the primary issue in dispute. When asked whether she was familiar with *Duperry* and had discussed it with the petitioner, trial counsel responded: "It didn't need to be because it wasn't an agreed upon disposition. You only need to do that canvass if you have an agreed upon disposition, and we did not have that. This was an opposed disposition." She also recalled having been contacted by Attorney Monte Radler, a public defender, after the criminal trial and "being pressured" to say that the petitioner's case was an agreed upon disposition. She testified that she told Radler that she "could not be a part of saying something that was not true. [She] would not perpetrate a fraud upon the court. . . . [She] had [that] conversation with many other people, including Judge Devlin. . . . [She] was . . . asked many times if this was an agreed upon disposition, and [she], quite emphatically, had told everybody the truth, which [is] that it was not an agreed upon disposition."

The petitioner also testified at his habeas trial. On cross-examination, he acknowledged that he had written a letter to his trial counsel asking her to say that the trial was not contested. On redirect, he testified that he never told his trial counsel to lie for him.

The habeas court in the present case made the following findings with respect to the petitioner's *Duperry* claim. After evaluating "the tenor and tone of the underlying proceeding to determine, after a scrupulous

---

[9] Trial counsel stated that, following the assault, the police did not test the petitioner for drugs or find any drugs on his person or following a search of his residence.

review of the record, whether the court trial was essentially nonadversarial," the court found that "neither the conclusions nor the rationales of *Duperry* and *Ouellette* support the petitioner's claim that the trial court's failure to canvass the [petitioner] with respect to his pursuit of the affirmative defense of not guilty by reason of [mental disease or defect] implicated his right to due process, as the underlying court trial was indeed adversarial and contested in nature, in that the prosecuting authority, although certainly fighting the weight of the evidence, did not agree, substantially or otherwise, with the petitioner's affirmative defense or a . . . commitment [to the board]. A lengthy review of the entirety of the evidence presented at the habeas trial, including the testimony of the witnesses and exhibits, [which include] the underlying trial transcripts, compel this court's finding.

"Chief among the dispositive testimony on this issue was the unwavering testimony of [trial counsel] that, despite her attempts to secure the agreement of the prosecuting attorney to an 'uncontested' [not guilty by reason of mental disease or defect] trial, the prosecuting attorney . . . 'refused to agree' as he was of the opinion that [a finding of not guilty by reason of mental disease or defect] and the accompanying disposition of commitment was not appropriate. It was his opinion, and that of the family of the victim, that the case was 'too serious' for [a not guilty by reason of mental disease or defect] disposition, despite the petitioner's clear and severe mental illness. The court credits [trial] counsel's testimony that [the prosecutor] was 'adamantly opposed to [a not guilty by reason of mental disease or defect] finding largely based on the petitioner's use of PCP, despite the lack of evidence of the petitioner's PCP use at the time of the attack on the victim. This court does not interpret [an exhibit submitted by the

petitioner][10] in the same manner as the petitioner in that the court does not find that it constitutes evidence of an uncontested [not guilty by reason of mental disease or defect] trial. The trial court, *Devlin, J.*, also stated that the potential drug ingestion component to the case made it clear to him that there was 'no guarantee' of [a not guilty by reason of mental disease or defect] verdict. This being the case, there was no necessity that the court canvass the petitioner in the manner asserted in the operative [habeas] petition." (Footnote added.)

The petitioner's contention in this appeal that the underlying criminal proceeding was not contested and adversarial in nature is based on his assertions that the state "substantially agreed" with his affirmative defense of mental disease or defect and that "any 'contest' was illusory." The petitioner notes that the defense did not challenge any of the evidence presented by the state relating to the charged offenses and that the state did

---

[10] The exhibit consists in part of an email communication between the petitioner's trial counsel and Radler, in which trial counsel stated, in part, that the prosecutor "had told [the victim's family] that [a verdict of not guilty by reason of mental disease or defect] would be the result. There was literally no outrage on their part." The exhibit was marked for identification purposes only and used at trial to refresh trial counsel's recollection as to whether she ever told Radler that the victim's family was not surprised about the outcome of the criminal trial. The court stated that it would consider the email in the exhibit for impeachment purposes only, as trial counsel testified that she could not recall making that statement to Radler. On appeal, the petitioner argues that the email constituted "clear evidence that trial counsel was aware that the state perceived the [not guilty by reason of mental disease or defect] verdict, prior to the verdict, as a foregone conclusion." The state correctly points out, however, that the email was not admitted for substantive purposes, which precludes our consideration of it in this appeal. See *Sharp Electronics Corp.* v. *Solaire Development, LLC*, 156 Conn. App. 17, 31 n.8, 111 A.3d 533 (2015) ("Documents marked at trial only for identification and not entered as full exhibits . . . are not substantive evidence for consideration by the trier of fact. See *State* v. *Kamel*, 115 Conn. App. 338, 345, 972 A.2d 780 (2009); see also C. Tait & E. Prescott, Connecticut Evidence (5th Ed. 2014) § 1.29.3, p. 93 ('[e]xhibits for identification are not in evidence').").

not contest that the petitioner was mentally ill. He further asserts that "[t]he state did not challenge the conclusions of the petitioner's experts . . . [or] offer its own expert to rebut such conclusions. The state did not even have the petitioner examined prior to trial to rebut the evidence to be presented by the petitioner. . . . In effect, everything aside from the issue of sanity was stipulated to [as was the case in *Duperry*]. See *Duperry* v. *Solnit*, supra, 261 Conn. 323 . . . . [T]he state cursorily argued that the [petitioner] had a history of drug use. . . . Indeed, aside from the inherent burden of proof that a defendant must establish, the sole issue in dispute was voluntary intoxication, such that would negate the [affirmative] defense. . . . However, there was no evidence that the petitioner had been voluntarily intoxicated at the time of the offense. . . . There was no evidence of drug use.[11] . . . The state acknowledged that the petitioner was mentally ill, but merely speculated during oral argument that drug use may have precipitated the violent outburst . . . ." (Citations omitted; footnote added.) We disagree with the petitioner's characterization of the state's position at the criminal trial.

The question before us of whether the habeas court properly determined that the underlying criminal proceeding was contested and adversarial in nature such that the trial court was not required to canvass the petitioner pursuant to *Duperry* involves a mixed question of law and fact, over which we exercise plenary review; see *Canady* v. *Commissioner of Correction*, supra, 231 Conn. App. 610; as we must determine whether the habeas court properly applied the legal requirements set forth in *Duperry* to its factual finding concerning the nature of the criminal trial. On the basis

---

[11] We note that, at the criminal trial, Judge Devlin specifically stated that the evidence of the petitioner's drug use consisted of the petitioner's statements to Westphal regarding his long history of using drugs.

of our thorough review of the record, including the transcripts of the petitioner's criminal trial, we conclude that the evidence in the record supports the habeas court's finding that the proceeding was adversarial and contested, and, thus, we agree with the habeas court's legal determination that the petitioner's criminal trial was not the type of proceeding for which a canvass pursuant to *Duperry* was required.

At the outset, the record indicates that the habeas court found that the criminal proceeding was contested and adversarial on the basis of its assessment of the credibility of trial counsel's testimony at the habeas trial. Specifically, the court found trial counsel's testimony to be unwavering with respect to the prosecutor's refusal to agree to an uncontested trial, and it credited trial counsel's "testimony that [the prosecutor] was 'adamantly opposed' to [a not guilty by reason of mental disease or defect] finding largely based on the petitioner's use of PCP . . . ." The habeas court also noted that, in her testimony at the habeas trial, trial counsel remarked that Judge Devlin had told the parties that there were no guarantees as to a verdict of not guilty by reason of mental disease or defect in light of the "drug ingestion component to the case . . . ." On the basis of those findings, the habeas court determined that the prosecuting authority "did not agree, substantially or otherwise, with the petitioner's affirmative defense," that "there was no necessity that the court canvass the petitioner" pursuant to *Duperry*, and, thus, that the petitioner had failed to carry his burden as to count one of the operative habeas petition.

"In a habeas trial, the court is the trier of fact and, thus, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony . . . . It is simply not the role of this court on appeal to second-guess credibility determinations made by the habeas court." (Internal quotation marks omitted.) *Balbuena*

v. *Commissioner of Correction*, 231 Conn. App. 289, 327, 332 A.3d 1008, cert. denied, 352 Conn. 905, A.3d (2025). "[T]his court does not retry the case or evaluate the credibility of the witnesses. . . . Rather, we must defer to the [habeas] [court's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *Brown* v. *Commissioner of Correction*, 230 Conn. App. 384, 399, 330 A.3d 134, cert. denied, 351 Conn. 921, 333 A.3d 103 (2025); see also *Lopez* v. *Commissioner of Correction*, 232 Conn. App. 825, 828, A.3d (2025) (" '[a] pure credibility determination made by a habeas court is *unassailable*' " (emphasis in original)). In the present case, the habeas court was free to find, on the basis of trial counsel's testimony, that the state had opposed or contested the petitioner's affirmative defense of mental disease or defect, despite the state's agreement that the petitioner suffered from a mental illness, and, because that finding was based on a credibility determination, it is unassailable.

Primarily on the basis of that factual finding, the court made a legal determination that the parties did not substantially agree on a not guilty by reason of mental disease or defect disposition for purposes of *Duperry*. The petitioner contends that the court improperly relied exclusively on trial counsel's subjective perception of whether a substantial agreement existed, thereby ignoring "the prophylactic purpose of *Duperry*," and that "[a] review of the record [of the criminal trial] demonstrates that this was not a truly contested case" and that the parties "substantially agreed" to the disposition. These contentions simply are not supported by the record, and, for the following reasons, we reject them.

Our resolution of the petitioner's claim rests on a construction of the language in *Duperry* requiring a canvass "in all future cases in which . . . the state *substantially agrees* with the defendant's claim of mental

disease or defect . . . ." (Emphasis added.) *Duperry* v. *Solnit*, supra, 261 Conn. 329. As we have stated, the court in *Duperry* did not define what it means to substantially agree. "[A]ppellate courts consistently have defined 'substantially' to mean to a considerable extent or degree." (Internal quotation marks omitted.) *State* v. *King*, 346 Conn. 238, 256, 288 A.3d 995 (2023); see also Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) p. 1245. The word "agree" is defined in part as "to concur in (as an opinion) . . . to consent to as a course of action . . . to accept or concede something . . . ." Merriam-Webster's Collegiate Dictionary, supra, p. 26. It follows, therefore, that, for the state to have substantially agreed with the petitioner's affirmative defense of mental disease or defect, it had to have consented to, accepted or conceded the affirmative defense to a considerable degree or extent. Although the petitioner is correct that "substantial agreement" does not mean that the state had to be in "complete agreement" with the affirmative defense of mental disease of defect, it nevertheless requires agreement with or acceptance of the affirmative defense to a large extent, such as what occurred in *Duperry*, in which "the parties presented their respective cases *without opposition*." (Emphasis added.) *Duperry* v. *Solnit*, supra, 314.

By contrast, in the present case the state opposed the petitioner's affirmative defense. First, in his case-in-chief, the prosecutor elicited testimony from Serrano that, in his efforts to stop the petitioner from attacking the victim, Serrano thought that the petitioner was "high on some drugs . . . ." Moreover, the prosecutor thoroughly cross-examined Westphal regarding his diagnosis of the petitioner, the petitioner's drug use, whether there is a violent aspect to patients with schizoaffective disorder, and whether the ingestion of PCP could cause an otherwise nonviolent person to become violent.

Although the petitioner attempts to minimize the drug component of the state's theory of the case, it was the central issue in contention. The petitioner's position, that the prosecutor's theory of the case relied on the petitioner's drug use as the possible cause for his violent outburst against the victim merely in a cursory fashion, is contradicted by the record. The prosecutor's line of questioning on his cross-examination of Westphal, as well as his closing argument, were aimed at demonstrating that the petitioner's assault of the victim was not prompted by his mental illness, as the petitioner's history demonstrated that he previously had been nonviolent, but, rather, may have been the result of the petitioner's use of PCP, which would have precluded the petitioner from establishing his affirmative defense under § 52a-13 (a) that he "lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law." See General Statutes § 53a-13 (b) (1) (affirmative defense of mental disease or defect precluded when proximate cause is due to voluntary ingestion of drugs); see also footnote 6 of this opinion. Indeed, it was clear from the prosecutor's closing argument that he contested whether the petitioner had met his burden of establishing his affirmative defense and that the state did not agree that the petitioner's mental illness was the cause of the assault. The fact that the prosecutor ultimately was unsuccessful in his opposition does not undermine our conclusion that he did indeed oppose the affirmative defense. In his argument to the contrary, the petitioner conflates the question of whether he met his burden of establishing his affirmative defense of mental disease or defect with the question of whether the prosecutor contested that affirmative defense.

Moreover, even though the prosecutor conceded that the petitioner suffers from a mental illness, that is just

one element of the affirmative defense. The second element, the causation element—whether, as a result of the mental disease or defect, the petitioner lacked the substantial capacity to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law—undoubtedly was contested by the prosecutor. Consequently, we agree with the habeas court's determination that the prosecutor did not substantially agree with the petitioner's affirmative defense of mental disease or defect. Accordingly, the habeas court properly determined that *Duperry* does not apply to the present case. The petitioner's first claim, therefore, fails.

## II

We next consider the petitioner's claim that the habeas court improperly determined that his trial counsel did not perform deficiently by failing to advise him regarding the canvass requirements of *Duperry* and his affirmative defense of mental disease or defect. The petitioner, relying on *State* v. *Ouellette*, supra, 271 Conn. 768–69, asserts that, even if the habeas court correctly determined that the underlying criminal proceeding was truly contested, "it was incumbent upon trial counsel to meaningfully convey the *Duperry* canvass requirements to the petitioner" and that "[a]dvising the petitioner of the canvass requirements set forth in *Duperry* was necessary" for trial counsel to ensure that the petitioner entered his plea knowingly and intelligently.[12] We do not agree.

---

[12] The petitioner confuses the language of our Supreme Court in *Ouellette* stating that, "in truly contested cases, we reasonably may presume that, in light of the adversarial nature of the proceeding, defense counsel will be particularly diligent in advising the defendant of the effect that a claim of mental disease or defect is likely to have on the defendant's rights"; *State* v. *Ouellette*, supra, 271 Conn. 768–69; as requiring counsel to convey the *canvass requirements* of *Duperry*, which, as our Supreme Court has made clear, must be conveyed only in cases in which " 'the state substantially agrees with the defendant's claim of mental disease or defect, with the result that the trial essentially is not an adversarial proceeding . . . .' " Id., 767.

We first set forth general principles of law that govern our review of claims of ineffective assistance of counsel. "In *Strickland* v. *Washington*, [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)], the United States Supreme Court established that for a petitioner to prevail on a claim of ineffective assistance of counsel, he must show that counsel's assistance was so defective as to require reversal of [the] conviction. . . . That requires the petitioner to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable. . . . Because both prongs . . . must be established for a habeas petitioner to prevail, a court may dismiss a petitioner's claim if he fails to meet either prong. . . .

"To satisfy the performance prong of the *Strickland* test, the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . .

"With respect to the prejudice component of the *Strickland* test, the petitioner must demonstrate that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. . . . It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceedings. . . . Rather, [t]he [petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. . . .

"It is axiomatic that courts may decide against a petitioner on either prong [of the *Strickland* test], whichever is easier. . . . [T]he petitioner's failure to prove either [the performance prong or the prejudice prong] is fatal to a habeas petition. . . . [A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." (Internal quotation marks omitted.) *Taft* v. *Commissioner of Correction*, 229 Conn. App. 548, 562–63, 327 A.3d 387 (2024), cert. denied, 351 Conn. 908, 330 A.3d 881 (2025).

The habeas court in the present case made the following findings in support of its determination that the petitioner failed to prove that trial counsel's representation was deficient: "First, as the court has found the credible evidence adduced supports [trial counsel's] characterization of the underlying court trial as 'adversarial' . . . the court finds summarily as follows: (1) [trial counsel] did not fail to advise the petitioner of the *Duperry* canvass requirements, as such requirements are inapplicable to the instant matter; (2) [trial counsel] did not fail to ensure that the petitioner was 'properly' canvassed. As this claim is duplicative of the claim immediately preceding, the same finding applies. There were no deficiencies in court canvasses in this matter; and (3) [trial counsel] was under no obligation to advise the petitioner of his opportunity to move to withdraw his plea or appeal the validity of his plea, as, given the inapplicability of [the] *Duperry* requirements to the instant matter, there were no deficiencies in the court's canvass.

"Additionally, the court credits the testimony of [trial] counsel. The court credits her testimony that after 'many, many conversations' between herself and the petitioner, '[they] made the decision together' that the [mental disease or defect] defense in [the] hopes of securing a . . . verdict [of not guilty by reason of mental disease or defect] was the best avenue to pursue. [Trial counsel] testified credibly [that] the petitioner believed, after consultation with mental health experts, that he would receive better mental health care in the custody of the respondent than with the Department of Correction. The consultations resulted in the production of reports that guided that defense team's decisions.

"[Trial counsel] testified that the petitioner was 'not always dealing with reality' and [that] 'many conversations' were necessary during the preparation of the defense. [Trial counsel] testified that she never guaranteed the [not guilty by reason of mental disease or defect] verdict, that she prepared [the petitioner] for the [potential] of a guilty verdict and a remand to [the] custody [of the Department of Correction], and [that she] advised him [that] the defense had to prove the [mental disease or defect defense] at trial. She further testified that she would have properly advised the petitioner that a [not guilty by reason of mental disease or defect] verdict was 'a very difficult disposition' to secure. . . . Further, [trial] counsel discussed options other than [a not guilty by reason of mental disease or defect] defense with the petitioner. . . . This court, based on the credible evidence adduced at the instant trial, finds that [trial] counsel's representation was not deficient, based on the petitioner's diagnoses, the underlying trial record, and the characterization of the incident in question. Finally, [trial] counsel testified credibly that the petitioner was 'happy' with the outcome of the underlying trial, as it was the outcome he

wanted [in that] he wished to be placed into a therapeutic setting rather than [with the Department of Correction] . . . ."

The habeas court also specifically found not credible the petitioner's testimony that, inter alia, he did not understand the consequences of asserting an affirmative defense of not guilty by reason of mental disease or defect and that his trial counsel failed to advise him regarding a commitment to the board. In particular, the habeas court found the petitioner's testimony to be "self-serving and contrary to the credited testimony of [trial] counsel" and that "his assertions find no support in any part of the record of credible evidence adduced in this [matter], including [in] any portion of the underlying proceedings as contained in the exhibits provided to this court. Specifically, the petitioner has failed to establish (1) that [trial] counsel failed to advise him of and explore options other than a [mental disease or defect] defense, (2) that [trial] counsel pressured him to pursue [a mental disease or defect] defense as opposed to exploring other options . . . (3) that [trial] counsel advised him of a brief/short period of commitment to the [board], and (4) that [trial] counsel failed to research the law and consequences of pursuing an agreed or contested [mental disease or defect] defense and to properly advise the petitioner."

In light of this court's conclusion in part I of this opinion that the canvass requirements of *Duperry* are inapplicable to the present case, which involved a contested criminal trial in which the state contested the petitioner's affirmative defense of mental disease or defect, the petitioner's claim that his trial counsel performed deficiently by failing to advise him regarding the *Duperry* canvass requirements necessarily fails.

To the extent that the petitioner also is claiming in this appeal that his trial counsel performed deficiently

by failing to advise him adequately regarding his affirmative defense of mental disease or defect, we conclude that this claim fails as well. The primary evidence offered in support of the petitioner's claim that his trial counsel performed deficiently was his own testimony at the habeas trial. The habeas court, however, specifically found not credible the petitioner's testimony that his trial counsel failed to properly advise him regarding his affirmative defense of mental disease or defect and that he did not understand the not guilty by reason of mental disease or defect process, as well as his contention that his trial counsel failed to advise him regarding a commitment to the board. On the other hand, the habeas court specifically credited trial counsel's testimony about the many conversations she had with the petitioner regarding his affirmative defense of mental disease or defect and the advice she had given him relating thereto.

"As our Supreme Court has observed, an appellate court does not . . . evaluate the credibility of the witnesses. . . . Rather, we must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . The habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony." (Internal quotation marks omitted.) *Smith* v. *Commissioner of Correction*, 179 Conn. App. 160, 173, 178 A.3d 1079 (2018); see also *Johnson* v. *Commissioner of Correction*, 229 Conn. App. 577, 614, 327 A.3d 916 (2024) ("[t]his court must defer to the habeas court's weighing of the facts and determinations of credibility"), cert. denied, 351 Conn. 902, 329 A.3d 239 (2025).

The habeas court's determination that trial counsel did not perform deficiently was based on its assessment of the credibility of the testimony of trial counsel and

the petitioner, and this court cannot disturb that credibility assessment. See *Smith* v. *Commissioner of Correction*, supra, 179 Conn. App. 173. "Because the petitioner's claim is premised entirely on issues of credibility, he cannot prevail." *Kellman* v. *Commissioner of Correction*, 178 Conn. App. 63, 72, 174 A.3d 206 (2017); see also *Ramos* v. *Commissioner of Correction*, 172 Conn. App. 282, 328, 159 A.3d 1174 ("[w]e will not disturb the habeas court's finding as it relates to the petitioner's credibility"), cert. denied, 327 Conn. 904, 170 A.3d 1 (2017). The habeas court, therefore, correctly determined that the petitioner failed to meet his burden of demonstrating that his trial counsel performed deficiently by failing to advise him properly regarding his affirmative defense of mental disease or defect.[13] See *Crocker* v. *Commissioner of Correction*, 220 Conn. App. 567, 590–94, 300 A.3d 607, cert. denied, 348 Conn. 911, 303 A.3d 10 (2023); *Coltherst* v. *Commissioner of Correction*, 208 Conn. App. 470, 483–84, 264 A.3d 1080 (2021), cert. denied, 340 Conn. 920, 267 A.3d 857 (2022).

Accordingly, we conclude that the habeas court properly denied the petitioner's operative habeas petition.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[13] In light of this determination, we need not address whether the petitioner established the prejudice prong of the *Strickland* test. See *Taft* v. *Commissioner of Correction*, supra, 229 Conn. App. 563.